[Philadelphia, December, 29, 1828.]

SHIELDS and others, Executors of SHIELDS, *against* OWENS.

IN ERROR.

A church, being in embarrassed circumstances, borrowed money of certain banks, for which two of its members gave notes drawn and indorsed by themselves. The banks having required further security, an agreement was entered into, by which, upon a third member of the congregation consenting to become an additional indorser upon the notes, thirty others bound themselves, in default of payment being made by the church, to make good the deficiency, so that the drawers and indorsers of the notes should not suffer loss, provided the said drawers and indorsers should continue their names on the notes to the end of the time required for the payment of the debt, which it was stipulated should be paid off in ten years, by annual instalments of ten per cent.; and in case the church should make default in paying these instalments, the subscribers to the contract agreed, that the deficiencies should be divided among them in equal parts. The notes were regularly renewed, from time to time, until the death of the last indorser, which took place a few years after the date of the agreement. After his death, his executors were called upon by a committee of the church to renew the notes, which the banks would have permitted under the circumstances of the case. The executors, however, refused to renew, suffered the notes to be protested, and afterwards paid them. After the lapse of several years, they brought this action against the defendant, as one of the thirty who had signed the agreement of indemnity, to recover his proportion of the instalments of ten per cent, which had become due prior to the commencement of the action. *Held,* that they had *substantially* complied with the contract of their testator, and were entitled to recover.

In the Court of Common Pleas of *Philadelphia* county, to which this was a writ of error, *Thomas, Robert, John* and *David Shields,* executors of *Thomas Shields,* deceased, brought this action to *September* Term, 1823, against *John Owens,* the defendant in error, to recover a sum of money alleged to be due under a certain agreement, bearing date the 28th of *July,* 1817.

It was agreed that the cause should be tried on the merits, without regard to the form of action or of the pleadings.

The charge of the President of the court below, which was filed agreeably to the directions of the act of assembly, contained the only statement of facts which appeared on the record. It was as follows:

King, President.—" This action is brought by the plaintiffs, acting executors of *Thomas Shields,* deceased, to recover, of the defendant, the sum of $———, which, it is supposed, he has become liable to pay to them under the following circumstances:—The Baptist Church, in *Sansom* Street, *Philadelphia,* was incorporated in the year 1811, and being in want of funds to carry on their building, several of the members borrowed money, for the use of the church, of the banks of *Pennsylvania* and *Philadelphia,* and gave them their promissory notes, which were discounted by these institutions, and the proceeds applied to the use of the church. The notes

(Shields and others, executor of Shields, *v.* Owens.)

commenced in 1811, and continued up to 1817; at first increasing, and afterwards diminishing in amount. The banks becoming dissatisfied with the security about this time, *Thomas Shields*, the deceased, then a member of the church, became an indorser upon the notes, in consequence of which, the credit given to the church was continued. To secure the testator from eventual responsibility, the stipulation or indemnity, which is the foundation of this action, was signed by *Thomas Shields*, by *John Owens*, the defendant, and twenty-nine others.

[His Honour here read the contract, which was in these words:]

"The Baptist Church, in *Sansom* Street, *Philadelphia*, of which the Lord has been pleased to make us members, being, at this time, under pecuniary embarrassment, on account of money borrowed for the use of the church, of the banks of *Pennsylvania* and *Philadelphia*, and, a further security being required, that a length of time may be given for the payment of said notes, we, the subscribers, do agree, and do hereby firmly bind ourselves, and our legal representatives, that, upon our brother, *Thomas Shields*, becoming one of the three indorsers of the notes in said banks (whose names will then stand as follows: *Joseph Maylin, C. F. Regnault*, and *Thomas Shields;*) that, in default of payment being made by the said church, in manner and time as hereafter specified, we will concontribute and make good such deficiencies to the utmost extent; so that the said drawer and indorsers shall not suffer any loss thereby. It being understood, expressly, that the parties to the said notes shall (whether drawer or indorsers) continue their names to the end of the time which may be required for payment of the same: the aggregate amount being six thousand three hundred dollars: and it being agreed, that the same shall be paid by instalments of ten *per cent. per annum*, to be paid off in ten years. And, in case of default of the church, in paying the instalments, the deficiencies shall be divided amongst us, in equal parts, according to the number of the subscribers to this instrument, and in no otherwise: and it is further agreed, that if any of the subscribers shall, in the space of three years from the date hereof, pay for him or herself, or procure and pay to the church (for the express purpose of paying the aforesaid sum of six thousand three hundred dollars) the full and entire sum which shall be his or her proportion of the said notes, dividing according to the number of the names subscribed to this instrument, the such person shall be released from all further obligation or responsibility, and his or her name be considered as taken off."

*Philadelphia*, 28th of *July*, 1817.

(Signed) *Thomas Shields*,
*John Owen* and 29 others."

"Mr. *Shields'* indorsement continued until his death, which took place on the 8th of *December*, 1819, during which time the notes were gradually reduced by the church, in amount, according to the

testimony of Mr. *Britton*, exceeding the ten *per cent.*, stipulated in the contract of indemnity.    At this time two notes were in bank, which had been discounted: one for $1700, in the bank of *Philadelphia*, dated the 27th of *September*, 1819, drawn by *Clarie François Regnault*, and indorsed by *Joseph Maylin*, and *Thomas Shields*, payable in ninety days; and the other in the bank of *Pennsylvania*, for $2300, dated the 29th of *September*, 1819, payable in ninety days, and drawn and indorsed by the same parties. *Thomas Shields* died intestate, and constituted his sons, *Thomas, Robert, John*, and *David Shields* his executors.    *Robert, John*, and *David* only, proved the will, and obtained letters testamentary. Immediately after the death of *Thomas Shields*, and before these notes became due, a committee was appointed, by the Baptist Church, to wait upon the executors and the bank, in order to arrange for the continuance of the notes.    Mr. *Britton* states, that he first called upon the President of the Bank of *Pennsylvania*, and inquired whether there would be any difficulty in renewing the notes in that bank.    Mr. *Norris* said, that he presumed there would be none; although it was not the usual course of business for executors to obtain discounts, he said, that under peculiar circumstances it might be done, and that he thought this was such a case.    A similar answer was received from Mr. *Campbell*, the cashier of the bank of *Philadelphia*.    The committee then waited upon the executors. Two of them, *Thomas* and *David*, were willing to renew: the others declined making an arrangement, and insisted upon the payment of the notes as they came to maturity.    In this conversation, the result of their interview with the officers of the banks, was communicated, by the committee, to the executors.    Both notes were, accordingly protested, and, subsequently paid and taken out of bank by the executors.    The plaintiffs afterwards proceeded against *Regnault* and *Maylin*, the previous indorser and drawer of the notes; and on the 27th of *November*, 1822, came to a compromise with them, by which, on the receipt of three promissory notes for $883, 33, each, drawn by *Maylin*, and indorsed by one *Edward Thomas*, the plaintiffs exonerated and discharged *Maylin* and *Regnault*, reserving their rights against the church and the signers of the guarantee.    In order to fully understand the grounds of defence, assumed in the cause, it is necessary, again, to refer to a period anterior to the death of *Thomas Shields*.    The Baptist Church was indebted; first, to the stockholders; secondly, for the principal of the ground rent upon which the church was built; thirdly, upon mortgage; and, otherwise, in a sum near $40,000.    Before the death of Mr. *Shields*, the members were desirous of paying off the notes upon which he was indorser.    Mr. *Shields*, himself, offered to subscribe $1000 towards this object, if an exertion was made, among the members, to effectuate its success.    A subscription was set on foot for this purpose, and a considerable amount subscribed.    In pursuance of this engagement, and while on his death bed, viz., on

the 26th of *November*, 1819, Mr. *Shields* signed an agreement to pay $1000 towards the liquidation of these notes, stipulating, however, that he should not be called upon to pay the amount, unless the whole $4000, due on the notes, were subscribed. The whole sum was not, however, raised at the time the notes became due, nor at any time afterwards. After the death of Mr. *Shields*, and before the notes became due, a society was formed, called "The Mite Society," whose object was to raise, by small contributions among the members, funds to meet the instalments due upon, and eventually to discharge these notes. More than $1000 were subscribed for this purpose. In consequence, however, say the defendant's witnesses, of the refusal of the plaintiffs to renew the notes, and of their insisting upon their payment, the efforts of the Mite Society were arrested, as was the previous subscription, towards which Mr. *Shields* was a subscriber for $1000. Those who subscribed, seeing their efforts likely to prove abortive, refused payment, and the church was compelled to make an assignment for the use of its creditors. Mr. *Britton* attributes this result to the refusal of the plaintiffs to renew, and believes, that if the notes had gone on, funds adequate for the settlement of them, would have been received from these sources. This witness states that the committee argued with the executors, that they could run no risk in signing these notes, as they were not only executors but heirs. There is no pretence that the estate was insolvent. It also appears, that the church contributed to the payments made by *Maylin*, and, that this was known to the plaintiffs. Such appears to be a compendious view of the defendant's testimony. The plaintiffs, by way of rebutting evidence, have adduced two certificates from the President of the *Pennsylvania* Bank, and the Cashier of the *Philadelphia* Bank, which have been read by consent, the object of which is to show, that it is not the general practice of these institutions to discount notes drawn and indorsed by executors in their official capacities. These gentlemen have also been examined before you, and have sustained their written statements. The plaintiffs have also adduced a notice, given by them to the trustees of the Baptist Church, upon the 1st of *April*, 1820, in which they offered to pay their father's subscription of $1000, towards liquidating the notes, if the church should raise the balance before the 20th of the ensuing *June*, and that, in default thereof, they should consider themselves discharged from all obligation to pay the subscription. This, however, was after the mischief was done. If the defendant's witnesses speak correctly, the notes had been protested the *December* preceding, and the train of disastrous circumstances which followed, had all occurred. The church has been sold since for $3750, subject to a mortgage, and a ground rent of $8000; a most severe sacrifice indeed.

"In order to enable us to come to a correct conclusion in this controversy, we are to inquire, what is the nature of the defendant's contract; has it been complied with, and if nay, are there any causes

(Shields and others, Executors of Shields, *v.* Owens.)

which, according to the principles of law and equity, will exempt him from responsibility, for or on an account of such breach. First, as to the nature of the agreement of the 28th of *July*, 1817, signed by the defendant and others. It is a contract of guarantee or indemnity. The church was the principal debtor; *Regnault, Maylin,* and *Shields,* sureties, and the signers of the agreement guarantees of those sureties. Its terms are explicit. The parties to it are bound for the default of the church, "in manner and time, as thereinafter specified." The manner was, "that the parties to the said notes (whether drawer or indorsers) should continue to the end of the time which might be required for the payment of the same." The time stipulated for, was, that the notes should be paid by instalments of ten *per cent. per annum,* to be paid off in ten years. A surety who, if a court of justice can have favourites, is always so, is merely bound by the precise terms of his contract. However the convenience of a modification may be to the party secured, or however desirable it may become, from a change in circumstances, the surety may answer, that he never entered into such a contract as that prepared to be substituted for his agreement. So, in the case before us; the death of *Thomas Shields* in no respect changed the nature and extent of the defendant's responsibility. It remained after that event as before; a contract, that the Baptist Church should extinguish the original debt in ten years, and at the rate of ten *per cent. per annum.* As respects this head of the cause, it is immaterial whether the banks would or would not have continued the discounts upon the indorsement of the executors. If *immediate payment* was coerced from the plaintiffs, the defendant was answerable over to them, only on the terms of his contract. The plaintiffs have actually conceded this position by bringing their action for the annual instalments, which have grown due since the 27th and 29th of *December,* 1819. If, indeed, the banks had refused to continue the discounts upon the credit of the plaintiffs, and, in consequence of this refusal, they paid the notes, the defendant would certainly have been responsible for the default of the church in paying the annual instalments. In such a case, although in form, the notes were not continued, yet the substance of the contract was complied with. The responsibility would not, in such a state of things, have been either increased or varied. But, whether the banks would or would not have continued the discounts upon the credit of the plaintiffs as-executors, becomes material, as an ingredient, in another view of the cause, which is now to be considered. This question, as all others in the cause, which are pure matters of fact, are for your decision. But, assuming that the banks would have continued these discounts, the estate, being fully adequate for their payment as for all other demands against it, has the refusal of the plaintiffs to accept the discounts, and their demand of immediate payment from the church, followed, as it was, by the insolvency of the church, produced any and what legal effect upon

the obligation of the defendant's contract? For, if the plaintiffs have done or omitted nothing which renders it against equity that they should recover, the fact of having paid the whole debt, and of not being reimbursed by the church, gives them an undoubted claim to recover the annual instalments due at the time of bringing this action. It is a well settled principle of law, that the creditor has no right to increase the risk or vary the contract of the surety. Beyond his specific engagement he is never bound. " Calculating, says Chief Justice KENT, " upon the extent of that engagement, he is not supposed to bestow his attention upon the terms of the transaction, and is only prepared to meet the contingency, when it shall arrive, in the mode and time presented in the contract." So strict has been the construction of the contracts of sureties, that a contract to indemnify a mercantile company against the non-payment of a customer, has been held to terminate with the removal of one of the partners, or, when given to one individual, to terminate upon his associating himself in trade with another. Nor, when given to a mercantile company of several, does it extend to survivors. Again, a contract to guaranty A., if he furnishes goods to B., will be of no avail to A., if through him, and upon his credit, the goods are furnished by G.; nor if the guarantee is given, if a greater credit is allowed, will it be available if a less one is given. These are examples of the strictness of construction given to the terms of a guarantee. Where there is no difficulty as to the extent of the contract, yet, if time is given to the principal debtor, by the creditor, without the assent of the surety, or if he does any act, varying the contract, and increasing the risk of the surety, the latter is discharged.

" To apply these principles to the case before us. First, as to the construction of the agreement of the 28th of *July,* as between *Thomas Shields,* whose name is attached to it, and the other parties to it. It was a contract that Mr. *Shields* should not call for payment of the money of the church at any other time or manner than was " *therein specified.*" Although the church was always responsible to the drawers and indorsers of the notes, in the event of their being called upon and actually paying the notes, yet *Thomas Shields,* if he desired to retain his claim against the guarantees, could not refuse to extend the stipulated credit to the church, nor resist an immediate payment. There would be no mutuality in a contract whereby a surety guaranteed the payment of a debt to the creditor, in regular instalments, if the creditor could immediately afterwards proceed against his debtor for the whole claim, and still retain his right to proceed from time to time against the surety, if he failed in getting payment in full. If this could be allowed, such would be the case here; for *Britton* says, the church aided *Maylin* in his payments, and the plaintiffs knew it. Engagements of the kind alluded to, are of every day's occurrence, and it never could be endured, that a creditor, after receiving such

(Shields and others, Executors of Shields, *v.* Owens.)

a security, should, after driving his debtor to insolvency by pro-ceeding at once for his whole claim, still retain the right to call upon the surety for the instalments as they became due.    The uni-versal object of entering into such responsibilities, is to give the principal debtor a chance to retrieve his shattered fortunes.    The ef-fect of proceeding at once for the whole arrear, always, if allowed, makes the surety pay the debt.    But if the debtor was let alone to pay the debt in the time and manner for which the surety has bound himself, he often would be able to do so.    This is a calculation which enters the mind of every prudent man who becomes surety under such circumstances.

" But if the construction we have given to this contract is ques-tionable, yet the evidence discloses facts, which, if believed by you, exhibit conduct calculated to increase the risk and vary the con-tract of the sureties, so as to bring this case within that class of de-cisions in which courts of equity have held the surety discharged. We will not again recapitulate them, but content ourselves with saying, that, if you believe from the evidence that the plaintiffs could have renewed their notes, but refused to do so, and demanded im-mediate payment by the church: that in consequence of such refu-sal and demand, the subscription of the members, and the contribu-tions of The Mite Society failed; and that this pressure produced the insolvency of the church, such a course of procedure was in-consistent with the rights of the sureties, and operates to discharge them from all liability upon their agreement."

The jury found a verdict for the defendant, agreeably to the charge of the court, and the record having been removed by writ of error to this court, the following errors were assigned.

1. That the court erred in the construction of the agreement of the 28th of *July,* 1817, signed by the defendant and others, and regarding it as a contract of indemnity, the Baptist Church the principal debtor, *Shields* and others, drawers and indorsers of the notes, as sureties, and the signers of the agreement merely as guar-antees of those sureties.

2. That the court erred in considering the defendant and the other signers of the said agreement as sureties merely, and apply-ing to them the principles of law as laid down in their opinion.

3. That the court erred in stating, that the executors of *Thomas Shields* were, by the terms of the said agreement, bound to conti-nue or renew the notes after his death, either by drawing or in-dorsing new ones.

4. That the court erred in charging the jury " that, if you believe, from the evidence, the plaintiffs could have renewed these notes, but refused so to do, and demanded immediate pay-ment by the church, that in consequence of such refusal and de-mand, the subscription of the members, and the contributions of The Mite Society failed, and that this pressure produced the insol-vency of the church, such a course of procedure was inconsistent

(Shields and others, executor of Shields, *v.* Owens.)

with the rights of the sureties, (meaning the defendant and the other signers,) and operates to discharge them from all liability upon their agreement."

*J. M. Read,* for the plaintiffs in error.

1. 2. 3. When the agreement of the 28th of *July,* 1817, was entered into, the parties knew that the banks look to individual responsibility alone, and are not in the habit of discounting notes, drawn or indorsed by executors as such. The contract must, therefore, be construed with reference to this practice, as it never could have been the intention of the parties to stipulate for the performance of an act, which did not depend upon themselves, or any persons over whom they had any control. The contract had reference to individuals, whom it was known the banks would take, and not to executors or administrators, whom it was known they would not take. In the instrument, the drawer and indorsers are universally spoken of as individuals, and in no part of it, is there any thing which looks like an intention to impose upon their representatives, after their death, the obligation of renewing their notes. Circumstances might have occurred even in the lifetime of those persons, which, by rendering the acts they had agreed to perform impossible, would have released them from their undertaking, without affecting their right to resort to those who had agreed to indemnify them. If the banks, from any cause, had refused to renew the notes, or if the charters of these institutions had expired, as that of the *Philadelphia* Bank actually did in 1824, though it was renewed; in either of these cases, the plaintiff's testator could not have complied with his agreement; and yet it is obvious, that a non-compliance under such circumstances, would not have been a forfeiture of his right to call on the signers of the agreement as often as the payments of ten per cent. became due. The death of the indorser is an event of the same character, which put it out of the power of the testator to perform his agreement, and so it must have been considered by the parties; for, when the well known practice of the banks forbade a renewal by executors, it cannot be supposed a contract was entered into in contemplation of so improbable an event, as that the banks would consider this to be a case of so peculiar a nature, as to induce them to contravene their established rule. It is true, that in many cases executors are bound, though not named; but it is not always so. They are not bound where the contract is for the mere personal act of the testator, which he alone can perform, and which, therefore, death puts an end to. 2 *Bac. Ab.* 69, *Covt. P.* 3 *Vin. Ab.* 381. 3 *Bac. Ab.* 95. *Cro. Eliz.* 552. 3 *Com. Dig.* 258, *Covt. c.* 1. *Cooke,* v. *Colcraft,* 3 *Wils.* 386. 2 *Wm. Bl.* 856. *S. C. The Commonwealth* v. *King,* 4 *Serg. & Rawle,* 109. The contract in the present instance was of this description; no one could perform it but *Thomas Shields* himself. It was to indorse his name upon the notes. For the executors to have indorsed them, would have been out of

(Shields and others, Executors of Shields, *v.* Owens.)

the usual course of their duty; and if it had been intended they should do so, that intention would have been declared. They were under no obligation to renew the notes either in their official or individual capacities. If they had done so, it would have been a voluntary act merely.

4. If the preceding argument be sound, there is error in the fourth specification also. If it was not the duty of the executors to renew the notes, it was of no importance in a legal point of view, whether or not their refusal produced the insolvency of the church, and all those disastrous consequences which are said to have ensued.

(The court having intimated that this point was the same in substance as those which preceded it, and that the only question was, whether the contract was terminated by the death of *Thomas Shields,* the argument was pressed no further.)

*Gilpin* and *J. R. Ingersoll,* for the defendant in error.—The object the parties had in view in entering into the agreement, which is the foundation of this suit, was, by giving time to the church, to enable it gradually to pay off its debts. It constituted a partnership of liability between the signers and the plaintiff's testator, who could not call upon those who had undertaken to secure him, without performance of his part of the contract. They mutually agree to become responsible, upon certain terms, which formed a condition precedent. The condition was, that *Shields* should not call upon the signers of the agreement in less than ten years, with the further condition that he should, during that period, renew the notes. The embarrassed situation of the church, called for such an arrangement, which, if it had been carried into full effect, would have eventuated in the payment of the debt, and the relief of the corporation. The agreement was entered into solely with this view, and the parties expressly stipulated for the terms and manner in which they were to become bound. In no other way, therefore, can they be bound. This engagement was strictly an engagement of suretyship, and is to receive the construction uniformly given to engagements of such a nature. It cannot be extended by implications beyond its express terms, *Miller* v. *Stuart,* 9 *Wheat.* 703. The undertaking of the signers of the agreement was to pay, if the church did not, provided ten years were allowed to the church, and provided the notes were renewed in the mean time. Time was of the first importance to them, in order to give full scope to the efforts of "The Mite Society," and to all other arrangements which had been made, or might be made, to promote the object. They therefore meant to guard themselves against being called upon within the period prescribed. In this state of things, what was the effect of the death of *Shields?* The debt to the banks remained. The obligation of the thirty to see that debt paid in exoneration of *Maylin, Regnault* and *Shields,* also remained. The only difference was, that the executors of *Shields*

were to take his place. He had provided for the payment of the debt, in a certain mode; this mode his executors might have adopted or rejected; but they could not adopt it in part, and reject it in part. They could not derive a benefit from the contract, without performing their own part of it. They could not repudiate it, as respected themselves, and at the same time claim under it. They suffered the notes to be protested; in consequence of which, the credit of the church was destroyed, and ruin followed; and they now ask to enforce this contract for their own benefit, against those, whom by their own acts they have injured. Whether or not the banks would have accepted the indorsement of the executors, is not material, because the engagement was for a renewal; and the defendant was not bound, unless the notes were renewed, at all events. But speculative argument is superfluous, because the fact was, and the jury have so found it, that the notes might have been renewed. It was one of those peculiar cases, in which the banks would have received the indorsement of the executors; and this fact was communicated to them by the committee, when they were applied to on the subject. The defence, therefore, now set up, was evidently an after thought. The contract was by no means of such a nature, that no one could perform it but *Thomas Shields* himself. It was not necessary that he should, with his own hand, affix his name to the notes. The responsibility of his estate was the object. If from illness, or any other cause, he had been deprived of the use of his hands, it will hardly be pretended that he might not have indorsed through the instrumentality of another person, and that if he had omitted to do so, he would have been released from his obligation, while his sureties remained bound. So on his death, his executors representing him, might have indorsed the notes instead of him. They were bound to perform the contract of their testator, whether named or not, and an action might have been sustained against them for their refusal. *Cro. Eliz.* 553. 1 *Wash. Virg. Rep.* 308. *Toller on Exrs.* 59, 60. That *Shields* himself considered the contract binding, after his dissolution, is evident, from the anxiety he evinced on his death bed to have the business settled; doubtless, anticipating trouble to his children if it were not. There was nothing in the way of a perfect fulfilment of the contract, and ultimate payment of the debt, in the manner contemplated, but the sullen and obstinate refusal of the plaintiffs to do their duty. If the judge had said, in general terms, that the death of *Thomas Shields* made no difference, he would not have been wrong; but he never said so, except in connexion with the facts of the case, which he left to the jury; and this court have often decided that the whole charge must be taken together, and not any one part by itself.

The opinion of the court was delivered by

Tod, J.—There are certain rules of equity which deal favourably with the contracts of sureties; yet those rules do not seem to us

(Shields and others, Executors of Shields, *v.* Owens.)

strictly to apply to the present case.   *Shields*, the testator, had his name upon the notes as indorser; but he did not receive the money, nor any part of it, nor was the original loan upon his credit, nor was he in any manner bound until induced to become indorser by a written stipulation of indemnity.   As far as one may be called a surety, who, without personal interest or prospect of gain to himself, lends his credit, and becomes bound for the debts of others, so far it would appear, that *Shields*, the testator himself, stood as a surety, rather than as a principal.   Shortly, the case is—The Baptist Church in *Sansom* Street, being in debt about forty thousand dollars, and about six thousand dollars of it being due to the *Philadelphia* Bank and the Bank of *Pennsylvania*, on loans obtained some years before, not upon the credit of the corporation but upon the notes of Mr. *Maylin* and Mr. *Regnault*, and the banks becoming dissatisfied with the security, and refusing to renew without an additional indorser, Mr. *Shields*, the testator, agreed to become this additional indorser, upon a previous written contract of indemnity, signed by *Shields*, himself, and by thirty other members of the congregation, among the rest by Mr. *Owens*, the defendant.   Upon that contract the present suit is brought: (His Honour here stated the contents of the agreement of the 28th of *July*, 1817.)

According to this agreement, *Shields*, the testator, continued to renew his indorsements at intervals of ninety days, as long as he lived, which was two or three years.   At his death the two debts had been diminished by payments to about one half.   His four sons, the plaintiffs, were left devisees of his estate, and executors of his will.   They were applied to on the part of the congregation, to renew and continue the indorsement of the notes.   Two of them were willing, and two refused.   There was some uncertainty of proof whether the banks would take an indorsement by men in the character of executors; but that matter was left as a fact to the jury, and I take it to be settled by the verdict, that the banks would have accepted such indorsement.   The notes were protested, and the executors, not waiting to be sued, paid the money and took up the notes; and after some years they bring this suit against Mr. *Owens*, claiming from him his contribution; viz. his share of the instalments of ten per cent. due at the time of commencement of the action.

The defence is founded upon the words of the agreement, which, it is argued, expressly require *Shields*, the testator, and of course his representatives, to continue the indorsements, and renew them to the end of the ten years, and that the executors, by paying off the notes instead of renewing them, and by becoming themselves the creditors in lieu of the banks, have forfeited their indemnity and all their right to the ten per cent. instalments.   Now I do not understand such to be the right construction of the agreement.   Manifestly the only object was to get credit, to gain a prolonged time of

(Shields and others, Executors of Shields, *v.* Owens.)

payment, to enable the congregation to pay off these debts gradually. The banks were no parties to the instrument. It was not for their profit. The notes were transferrable property, and known to be so by the contributors. In substance they have been fairly and legally transferred to these executors; and by the transfer no conceivable injury is done to the congregation, or to the signers of the indemnity, unless it is an injury to their estates or to their credit to owe money to individuals rather than to a bank, and to pay six per cent. interest for it rather than the bank interest of nearly seven per cent. According to the true intent and meaning of the paper, I should say that *Shields*, the testator himself, by paying off the notes at any time, had he been able, would not thereby have lost his indemnity, provided that in consequence he demanded nothing more than the annual instalments from the signers. But we do not decide that point. The testator did not pay. He continued the indorsements while he lived. He could do it without much inconvenience. But the case seems very different as to the executors. We are all of opinion they took the only fair and practicable mode of performing their father's contract, by paying the notes, taking them up and waiting for the yearly instalments for their reimbursement. How they and the other parties to the notes could be able, consistently with the rules of law or convenience, to get along for a series of years, binding by indorsements every ninety days, not themselves but the estate of a man deceased, is a difficulty which need not be settled, because the law is clear that executors having assets, giving a note for a debt due from their testator's estate, though they expressly name themselves executors in the contract, do not thereby bind their testator's estate; but they, themselves, are bound personally. *Geyer* v. *Smith*, 1 *Dall.* 347. *Toller's Law of Executors*, 464. Therefore, by indorsing, here would have been six indorsers instead of three, and the executors liable personally for the default, not only of the two original indorsers, but of each other.

It is denied by the plaintiffs' counsel, that the engagement by the testator to lend his credit, is that sort of contract which can be legally binding upon his representatives; being but a mere personal undertaking. Without entering into that inquiry, it is certain that the contribution promised by *Owens* and the rest, being conditional, the condition must be *substantially* performed somehow before the indemnity can be claimed. We think, that *in substance*, the condition has been performed by the executors.

In this court and in the court below, the cause has been placed partly on the ground of injury done by the plaintiffs, by not only refusing to indorse, but by demanding immediate repayment of the money to them. Some proof was given that the conduct of the plaintiffs stopped certain payments which would have been made by the members of the church, and was pernicious to the corporation. Upon the credit which the jury might think fit to give to that evidence, the cause was put, in part at least, by the charge of the court.

(Shields and others, Executors of Shields, *v.* Owens.)

It appears to us, that the plaintiffs' demand of the money, if made upon the corporation, was frivolous; if upon the signers of the indemnity, before the instalments, or some of them, had become payable, it was nugatory.    Notwithstanding the demand, the executors wisely forbore to sue; and whatever injury has followed, seems to have been produced by a cause too small for the law to take cognizance of.    Upon the whole, our opinion is, that there is error, and that the judgment be reversed, and a *venire facias de novo* awarded.

Judgment reversed, and a *venire facias de novo* awarded.